TRADEX V. LACM , et al.

# EXHIBIT 1

EXHIBIT 1

Name of Offeree: _____ Memorandum Number: _____

### Confidential Private Placement Memorandum
### March 2007

### Last Atlantis Partners SPC Ltd
### a British Virgin Islands Segregated Portfolio Company

This Confidential Private Placement Memorandum (this "Memorandum") is provided to you on a confidential basis solely in connection with your consideration of an investment in shares (the "Shares") of Last Atlantis Partners SPC Ltd, a British Virgin Islands segregated portfolio company (the "Fund").

*This Memorandum may not be reproduced in whole or in part without the prior written consent of the Fund Manager, Last Atlantis Capital Management LLC ("LACM" or the "Fund Manager").*

*Securities Offered: Redeemable Non-Voting Shares, par value $0.01*

*Price Per Share: US $1,000*

*Minimum Subscription per Investor: US $1,000,000*

**THE DISTRIBUTION OF THIS MEMORANDUM AND THE OFFERING OF THE SHARES OF THE FUND MAY BE RESTRICTED IN CERTAIN JURISDICTIONS. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION TO ANYONE IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION. IT IS THE RESPONSIBILITY OF EVERY PERSON WISHING TO MAKE APPLICATION IN CONNECTION HEREWITH TO SATISFY HIMSELF AS TO FULL OBSERVANCE OF THE LAWS OF THE RELEVANT JURISDICTION IN CONNECTION THEREWITH, INCLUDING ANY GOVERNMENTAL OR OTHER CONSENTS WHICH MAY BE REQUIRED, OR TO OBSERVE ANY OTHER FORMALITIES NEEDING TO BE OBSERVED IN SUCH JURISDICTION AND TO PAY ALL TRANSFER AND OTHER TAXES REQUIRED TO BE PAID IN SUCH JURISDICTION.**

**THE SHARES ARE NOT LISTED IN OR REGISTERED IN ANY JURISDICTION AND NO GOVERNMENTAL AUTHORITY OR AGENCY HAS REVIEWED OR PASSED UPON THIS OFFERING.**

The Shares have not been and will not be registered under the United States Securities Act of 1933, as amended (the "Securities Act"), and the Fund has not been registered as an

investment company under the United States Investment Company Act of 1940, as amended. Accordingly, the Shares may not be offered, sold or delivered, directly or indirectly, in the United States or to any US Person, as defined below, except to a US Person which is a discretionary account or similar account (other than an estate or trust) held for the benefit or account of a person who is not a US Person by a dealer or other professional fiduciary organized, incorporated or (if an individual) resident in the United States, in each case in accordance with the provisions of Regulation S under the Securities Act. The term "United States" means the United States of America (including the States thereof and the District of Columbia), its territories, its possessions and other areas subject to its jurisdiction. The term "US Person" means (i) any citizen or resident of the United States, or any corporation or partnership chartered or organized under the laws of any jurisdiction in the United States or any trust or other entity chartered or organized under the laws of any jurisdiction in the United States or that is subject to United States Federal income tax on its worldwide net income regardless of source and/or (ii) any "US Person" as defined in Rule 902(o) of Regulation S under the Securities Act.

**THE SHARES OFFERED HEREBY INVOLVE A HIGH DEGREE OF RISK. SEE "THE FUND - FUND OBJECTIVE", "RISK FACTORS" AND "CONFLICTS OF INTEREST".**

*Any inquiries should be directed to:*
Last Atlantis Capital Management LLC
1212 Bjerge Gade, Lower Level, St. Thomas, USVI 00802
Phone: (340) 777-5170 | Email: info@lastatlantis.com

## GENERAL NOTICES

PURCHASES OF SHARES ARE SUITABLE ONLY FOR PERSONS OF SUBSTANTIAL FINANCIAL MEANS WHO CAN MAKE A LONG TERM INVESTMENT, CAN BEAR THE RISK OF LOSS IN THEIR INVESTMENTS IN THE FUND AND HAVE NO NEED FOR LIQUIDITY IN THEIR INVESTMENT. THERE IS NO MARKET FOR THE SHARES AND NONE IS EXPECTED TO DEVELOP. THE FUND MANAGER RESERVES THE RIGHT TO REJECT THE SUBSCRIPTION OF ANY PROSPECTIVE INVESTOR FOR ANY REASON.

A PROSPECTIVE INVESTOR, BY ACCEPTING DELIVERY OF THIS MEMORANDUM, AGREES TO PROMPTLY RETURN TO THE FUND OR THE FUND MANAGER THIS MEMORANDUM AND ANY OTHER DOCUMENTS OR INFORMATION FURNISHED IF THE PROSPECTIVE INVESTOR ELECTS NOT TO PURCHASE ANY OF THE INTERESTS OFFERED HEREBY.

EXCEPT AS OTHERWISE INDICATED, THIS MEMORANDUM SPEAKS AS OF THE DATE HEREOF. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE FUND AFTER THE DATE HEREOF.

THIS MEMORANDUM CONTAINS SUMMARIES BELIEVED BY THE FUND AND THE FUND MANAGER TO BE ACCURATE WITH RESPECT TO THE CONTENTS OF CERTAIN DOCUMENTS, BUT INVESTORS SHOULD REFER TO THE ACTUAL DOCUMENTS COPIES OF WHICH EITHER ACCOMPANY THIS MEMORANDUM OR ARE AVAILABLE FROM THE FUND MANAGER UPON REQUEST FOR COMPLETE INFORMATION CONCERNING THE TERMS THEREOF, AND ALL SUCH SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE CONTENTS OF SUCH DOCUMENTS.

NO REPRESENTATIONS OR WARRANTIES OF ANY KIND ARE INTENDED OR SHOULD BE INFERRED WITH RESPECT TO THE ECONOMIC RETURN OR THE TAX CONSEQUENCES FROM AN INVESTMENT IN THE FUND.  NO ASSURANCE CAN BE GIVEN THAT EXISTING LAWS WILL NOT BE CHANGED OR INTERPRETED ADVERSELY TO THE FUND OR THE SHAREHOLDERS. PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THIS MEMORANDUM AS LEGAL OR TAX ADVICE.  EACH PROSPECTIVE INVESTOR SHOULD CONSULT WITH ITS OWN COUNSEL AND ACCOUNTANT FOR ADVICE CONCERNING THE VARIOUS LEGAL, TAX, AND ECONOMIC CONSIDERATIONS RELATING TO THE PROSPECTIVE INVESTMENT. THE FUND AND THE FUND MANAGER DISCLAIM ANY AND ALL LIABILITIES FOR REPRESENTATIONS OR WARRANTIES, EXPRESSED OR IMPLIED, CONTAINED IN, OR OMISSIONS FROM, THIS MEMORANDUM OR ANY OTHER WRITTEN OR ORAL COMMUNICATION TRANSMITTED OR MADE AVAILABLE TO THE RECIPIENT.

THE FUND SHALL MAKE AVAILABLE TO EACH PROSPECTIVE INVESTOR OR ITS INVESTMENT REPRESENTATIVE, DURING THIS OFFERING AND

PRIOR TO THE SALE OF ANY SHARES, THE OPPORTUNITY TO ASK QUESTIONS OF AND RECEIVE ANSWERS FROM THE FUND MANAGER OR ITS REPRESENTATIVE CONCERNING ANY ASPECT OF THE FUND AND ITS PROPOSED BUSINESS AND TO OBTAIN ANY ADDITIONAL RELATED INFORMATION TO THE EXTENT THE FUND MANAGER POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.

THIS MEMORANDUM DOES NOT PURPORT TO BE ALL-INCLUSIVE OR TO CONTAIN ALL THE INFORMATION THAT A PROSPECTIVE INVESTOR MAY DESIRE IN INVESTING IN THE FUND. IN MAKING AN INVESTMENT DECISION, PROSPECTIVE INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE FUND AND THE TERMS OF THE OFFERING MADE HEREBY, INCLUDING THE MERITS AND RISKS INVOLVED. PROSPECTIVE INVESTORS ARE URGED TO REQUEST ANY ADDITIONAL INFORMATION THEY MAY CONSIDER NECESSARY IN MAKING AN INFORMED INVESTMENT DECISION. EACH PROSPECTIVE INVESTOR IS INVITED, PRIOR TO THE CONSUMMATION OF A SALE OF ANY INTERESTS IN THE FUND TO SUCH AN INVESTOR, TO ASK QUESTIONS OF, AND TO SEEK ADDITIONAL INFORMATION FROM, THE FUND MANAGER CONCERNING THE FUND AND THIS OFFERING. A PROSPECTIVE INVESTOR SHOULD NOT SUBSCRIBE FOR THE SHARES UNLESS SATISFIED THAT IT AND ITS INVESTMENT REPRESENTATIVE (IF ANY) HAVE ASKED FOR AND RECEIVED ALL INFORMATION, WHICH WOULD ENABLE THEM TO EVALUATE THE MERITS AND RISKS OF THE PROPOSED INVESTMENT.

NO PERSON OTHER THAN THE FUND MANAGER HAS BEEN AUTHORIZED TO MAKE REPRESENTATIONS, OR GIVE ANY INFORMATION, WITH RESPECT TO THE SHARES, EXCEPT THE INFORMATION CONTAINED HEREIN, AND ANY INFORMATION OR REPRESENTATION NOT CONTAINED HEREIN OR OTHERWISE SUPPLIED BY THE FUND MANAGER MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE FUND OR ANY OF ITS MEMBERS.

THIS OFFERING MAY BE WITHDRAWN AT ANY TIME AND IS SPECIFICALLY MADE SUBJECT TO THE TERMS DESCRIBED HEREIN. THE FUND MANAGER RESERVES THE RIGHT TO REJECT ANY SUBSCRIPTION, IN WHOLE OR IN PART, OR TO ALLOT TO ANY PROSPECTIVE INVESTOR LESS THAN THE AMOUNT OF SHARES SUBSCRIBED FOR BY SUCH PROSPECTIVE INVESTOR.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY:

    (A)    BY ANYONE IN ANY STATE OR JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED, OR IN WHICH THE PERSON MAKING SUCH AN OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO;

    **(B)**     **TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SOLICITATION.**

**IT IS THE RESPONSIBILITY OF ANY INVESTOR PURCHASING SHARES TO SATISFY ITSELF AS TO FULL OBSERVANCE OF THE LAWS OF ANY RELEVANT JURISDICTION IN CONNECTION WITH ANY SUCH PURCHASE, INCLUDING OBTAINING ANY REQUIRED GOVERNMENTAL OR OTHER CONSENTS OR OBSERVING ANY OTHER APPLICABLE REQUIREMENTS.**

# Table of Contents

Title Page ........................................................................................................... 1
General Notices ................................................................................................. 3
The Fund ............................................................................................................ 8
    Overview........................................................................................................ 8
        Fund Structure ......................................................................................... 8
        Fund Manager .......................................................................................... 8
        Management Team ................................................................................... 10
        Business of the Fund .............................................................................. 14
        Master Feeder Structure ........................................................................ 14
        Cross Liability ....................................................................................... 15
        Fund Objective....................................................................................... 15
    The Offering ................................................................................................ 16
        Shares Being Offered............................................................................. 16
        Eligible Investors .................................................................................. 17
        Subscription Terms and Procedure ....................................................... 20
        Fund Manager Subscription .................................................................. 21
    Investor Liquidity ....................................................................................... 21
        Redemptions .......................................................................................... 21
        Redemption Proceeds ............................................................................ 22
        Redemption Rights ................................................................................ 22
        Distributions ......................................................................................... 22
        Transfers of Shares ............................................................................... 22
     Determination of Net Asset Value.......................................................... 22
    Fees and Expenses ...................................................................................... 23
        Fund Expenses ...................................................................................... 23
        Segregated Portfolio Expenses ............................................................. 23
        Asset Management Fee .......................................................................... 23
        Performance Fee .................................................................................... 24
    Reporting .................................................................................................... 24
        Reports .................................................................................................. 24
    Segregated Portfolios.................................................................................. 25
        LACM Split Strike Conversion, Segregated Portfolio A-2 ................. 26
        LACM Enhanced Multi-Strategy Segregated Portfolio M ................. 27
        LACM Enhanced Multi-Strategy Segregated Portfolio ML................. 29
        LACM Total Diversified, Segregated Portfolio T ................................ 30
    Risk Factors ............................................................................................... 31
        Market Risk ........................................................................................... 31
        Strategy Risk ......................................................................................... 31
        Manager Risk ........................................................................................ 34
        Lack of Operating History .................................................................... 35
        Fund Structure Risk .............................................................................. 35
    Conflicts of Interest .................................................................................... 37
        Non-Exclusive Relationship ................................................................. 37
        Performance Allocations ....................................................................... 37
        Compensation from Managers............................................................... 38
        Participation of the Fund Manager
            in the Organization of the Fund ................................................. 38

Payments for Referrals of Prospective
    Shareholders ......................................................... 38
Brokerage and Portfolio Transactions .................................................. 38
British Virgin Islands Regulations.................................................. 39
Tax Information.............................................................................. 40
Anti-Money Laundering Regulations ..................................................... 40
Additional Information .................................................................. 40
Shareholder Representation .................................................. 40
Privacy Notice ................................................................... 41
Categories of Information Collected...................................................... 41
How the Collected Information is Used ................................................ 41
Investor Suitability Standards............................................................. 42
Fund Directory.………………………………………………………43

Additional Information ................................................................. 42
Exhibit A – Memorandum and Articles of Association(Attached under separate cover)
Exhibit B – Subscription Agreement ........................... (Attached under separate cover)
Exhibit C – Redemption Forms ................................... (Attached under separate cover)

## The Fund

The following is qualified in its entirety by the information appearing elsewhere in this Memorandum, including the Exhibits. Capitalized terms in this Memorandum, unless otherwise defined herein, are defined in the Fund's Memorandum and Articles of Association in the form that accompanies this Memorandum (the "Memorandum and Articles of Association").

## Overview

**Fund Structure**    Last Atlantis Partners SPC Ltd (the "Fund") is a company limited by shares structured as a segregated portfolio company under the Business Companies Act 2004, as amended of the laws of the British Virgin Islands. The Fund will be the offshore feeder fund in a master-feeder structure. Last Atlantis Partners Master Fund SPC, Ltd (the "Master Fund"), a company constituted as a segregated portfolio company under British Virgin Islands law will serve as the master fund and Last Atlantis Partners LLC will be the onshore feeder fund in the structure. The Fund and the onshore feeder fund will invest their assets into the Master Fund. (see paragraph on "Master-Feeder Structure" on page 15). The Fund was incorporated in March 2007. The Fund allocates its assets to various investment managers (the "Managers") through a series of classes of shares ("Segregated Portfolios") that are traded by the Managers. Certain Segregated Portfolios will be managed by Last Atlantis Capital Management LLC (the "Fund Manager" or "LACM"), while other Segregated Portfolios will invest with outside managers. LACM will access the outside managers with a direct investment or through a fund. You may allocate your investment in the Fund to a single Manager or to multiple Managers currently trading for the Fund, subject to certain minimum investment requirements that may or may not be waived, at the sole discretion of the Fund Manager. Please see the section entitled "Segregated Portfolios" for specific information relating to each Segregated Portfolio.

**The Shares**    The Fund is authorised to issue 200,100 Shares comprising a single class of 100 general shares of no par value (the "General Shares") (all of which are held by the Fund Manager) and four classes of segregated portfolio shares comprising 50,000 shares in each portfolio. The Segregated Portfolios will be issued to investors whose subscriptions are accepted by the Fund. The Master Fund has the same share structure that of the Fund.

**Fund Manager**    The Fund and the Master Fund are managed by Last Atlantis Capital Management LLC, a United States Virgin Islands limited liability company (the "Fund Manager"), who is responsible for the selection of the Fund's and the Master Fund's Managers and the allocation of the Fund's and the Master Fund's assets to the Managers and/or the underlying investments ("Underlying Investments"). The Fund

Manager will also be responsible for trading several of the Segregated Portfolios of the Fund and the Master Fund. The Fund Manager is registered with the Commodity Futures Trading Commission ("CFTC") as a commodity pool operator ("CPO") and a commodity trading advisor ("CTA"), and is a member of the National Futures Association ("NFA").

The Fund Manager will manage the Fund's and the Master Fund's day-to-day investment and other business operations. The Fund Manager is authorized in the Management Agreement between itself and the Fund to engage various agents and service providers to assist in these management activities. There is a separate management agreement in place between the Master Fund and the Fund Manager.

The address of the Fund Manager is:

1212 Bjerge Gade, Lower Level, St. Thomas, USVI 00802
Telephone: (340) 777-5170
Email: info@lastatlantis.com

**Management Team**     The key personnel of the Fund Manager are as follows:

***Irwin Berger - Managing Director, Operations.*** Irwin has over 20 years of experience in the alternative investment industry and is responsible for marketing Last Atlantis Capital Management's investment products and overseeing the overall operations of the firm. Prior to founding LACM, Irwin was Vice Chairman of Sjo, Inc. Irwin's wide-ranging capabilities contributed to Sjo's success in raising over $375 million in managed futures assets. Irwin pioneered the trading of interest rate futures in the Australian and Asian markets for the alternative investment industry. Before his involvement at Sjo, Inc., Irwin was a Research Analyst at The Chicago Corporation's fixed income department, where he was responsible for analysis of hedging strategies for Savings and Loan clients. Prior to this, he was the Vice President of Marketing at Union Planters Futures Corporation where he developed and marketed hedging programs for Savings and Loans. He has also lectured at Northern Illinois University's College of Business. Irwin has written numerous articles on trading and risk management, which have appeared in professional and trade publications worldwide. Additionally, Irwin was a regular contributor to the futures market report on the Financial News Network cable television station and the MONY radio commodities report. He has appeared as a speaker at numerous alternative investment conferences and industry events. Irwin has an MBA and BS in Marketing from Northern Illinois University and holds a Series 3 license.

***Stig Ostgaard – Managing Director, Trading and Research.*** Stig is responsible for research and development of internal trading strategies and overseeing trading operations for Last Atlantis Capital Management. His responsibilities will also include evaluation and monitoring of outside managers for existing and proposed Segregated Portfolios. He has over 25 years of experience in the alternative investment industry. Formerly, Stig was Chief Executive Officer of Sjo, Inc. He was the main designer and manager of the original Sjo trading system and the research efforts of the firm. He also supervised a staff of 25 employees including a staff of 10 traders operating a 24-hour trading desk. As Sjo's head trader, Stig was responsible for managing the firm's futures trading strategies. After becoming one of the first CTA entrants into Australia, Sjo quickly became one of that market's major traders in bank bills. The firm was also a pioneer in developing a global managed futures interest rate program. During Stig's tenure at Sjo, he led the firm to a one and a half percent (1.5%) market share of the managed futures industry. In 1988, his trading programs made the Sjo Fund the #1 performing managed futures fund of the year. In 1991, he was selected by *Business Week* magazine as the "Commodities Trader of the Year". Stig has also written numerous articles for industry publications. Prior to his position at Sjo, Inc., Stig traded a sizable futures portfolio on behalf of a well-known Chicago commodity trader

in a program that became popularized as the "Turtle Trading Program". In 1989, the *Wall Street Journal* ranked Stig as the highest performing Turtle. Stig has an MBA in Finance from Northern Illinois University where he has lectured in the School of Business Finance Department. He also holds a Series 3 license.

**Jerry Sychra - Director of Pattern Recognition and Neural Net Research** Jerry's responsibilities at Last Atlantis Capital Management include collaborating with the Director of Trading Research as well as the Research and Development team to apply neural networks and pattern recognition to the development and implementation of trading systems in the alternative investment environment. Jerry is an expert in mathematics, statistics and pattern recognition. He has Ph.D.s in mathematical physics and natural sciences and postgraduate courses in applied mathematics. Most recently he has been a consultant in biostatistics and pattern recognition at the University of Illinois Norzyme Thera Test Laboratories where he designed experiments, did custom mathematical and statistical modeling of laboratory processes, and provided the data analysis of new drug development and patent trials. Prior to this he was a professor of mathematics and statistics at the University of Illinois, Benedictine University, Roosevelt University, and Morton College. Jerry has also supervised research and development projects involving the prediction of failures of electro-mechanical systems, the detection and localization of brain activity in SPECT images, finding algorithms for the analysis of functional cerebral blood flow, designing a statistical method for the detection of small tumors and of brain activation in MRI/SPECT images, and using artificial neural networks for the analysis of medical data. At the University of Chicago, he was an Associate Professor, Research Associate, and scientist in pattern recognition where he discovered a cyto-morphometric marker of uterine cancer by pattern recognition analysis of microscopic images of normal Pap smear cells, designed a 3-D method for measurement of air flow by a set of Doppler radars, and measured air turbulence by stochastic analysis of radar signal.

**Aaron Hein – Managing Director, Research.** Aaron is responsible for the company's Quantitative Intraday Futures Trading and Equities Statistical Arbitrage products, and has developed the testing infrastructure, trading systems, as well as the products' trading methodology and procedures. The primary tools and technology he developed include the Futures Market Tick Data Database, the LAC Historical Testing Cluster, including software designed for brute force optimization of extensive parameter spaces. He also developed the ASDM Analyzer that simulates walk-forward analysis of tens of thousands of systems using historically derived trade lists. His System Auto Selection Tool is objective decision-making software for selecting trading baskets, and the System Analyzer is a suite of GUI tools that perform system performance checks and statistical analysis as well as portfolio analysis. Prior to joining the Fund Manager's Aaron

was a project manager with Integrated Project Management where he managed cross-departmental activities, developed technologies, and integrated third-party solutions to deliver project objectives. With Compressor Development Corp., Aaron directed daily operations of the engineering firm and implemented process optimization strategies to manage business growth. Aaron holds a Bachelor of Science degree in Civil Engineering (Project Engineering and Management emphasis) from the University of Illinois

***Joseph Burke – Managing Director, Trading*** Joe oversees the trading operations for the firm's fund operations. In addition to managing individual traders, Joe troubleshoots and implements the company's proprietary trading systems. He participates in new trade strategy development, analysis, and implementation. As part of this role, Joe provides trade risk analysis and assessment for each program, and spearheads project development.

***Wendy Parker – Managing Director, Business Development*** Wendy develops and directs the Fund Manager's new business and client relationship initiatives. Prior to joining the Fund Manager's, Ms. Parker served as a marketing director for a number of for- and not-for-profit organizations in the US and Japan. In addition to overseeing marketing program development and planning, she established training guidelines and educational programs structured to enhance client experience and ensure cross-departmental continuity. Ms. Parker holds a BA (Hons) joint MA in Social and Political Sciences degree from New Hall College Cambridge University.

***Paul Huggins – Director, Informational Systems*** Paul designs and applies sophisticated data integrity programs that check for lost data, error data, mislabeled data files, and out of order data from real-time acquisition systems, and that simultaneously compare multiple data streams for consistency. Previously, Paul was a Senior Site Engineer for Yahoo! Canada specializing in security for Canadian banking and insurance products. He was the hiring manager for the initial Yahoo! Canada technical team and was responsible for overseeing internal project management, development tool selection, and environment growth. For Maysec, he was the Senior Integrations Consultant responsible for IT code security consulting, in-house tools, and managed web app frameworks. With Shaw Communications, Paul's primary duties included Shaw's IT and systems integration with @Home Corporation. Paul has extensive experience working with most web application languages, including Perl, C++/C#, Java, XML, JavaScript; Unix- and Microsoft-based operating systems; Oracle, Sybase, Microsoft, Postgres and MySQL databases; plus an extensive array of protocols, application servers, productivity applications, IT toolkits, practices and methodologies. Paul is fluent in English and French. He holds Faculty of Applied Science (Electrical Engineering)

and Faculty of Arts and Science (Physics & Math) degrees from Queen's University (Canada).

***William Cogley – Senior Research Trader*** William oversees back office trade operations, and technical support. He maintains the firm's IT infrastructure, and coordinates new hardware acquisition and implementation.

***Steve Cohen – Senior Research Trader*** Steve develops and troubleshoots new proprietary trading systems, and participates in new strategy analysis, and implementation. He also sets standards for the firm's trading systems, including trading methodology and procedures. Previously, Steve developed and managed proprietary options trading programs for Brian Schaer, Inc., Sparta Group, and Last Atlantis Capital LLC. With Richter Financial, Steve developed new money management models for trading stocks and options. He has also worked as a floor trader and new trader mentor for numerous firms on the Midwest Stock Exchange and the Chicago Board Options Exchange. Steve earned a BA degree in Finance from the University of Illinois. He also holds a Series 7 license.

***Seth Tapins – Senior Research Trader*** Seth oversees the company's proprietary black box trade operations. Responsibilities include monitoring all data and technical infrastructure integrity. He provides back office and trade desk support for the company's proprietary trading systems.

**Administrator**  Folio Administrators Limited (the "Administrator") has been appointed as administrator of the Fund pursuant to an Administrative Services Agreement between the Fund and the Administrator. The Administrator will perform all general administrative tasks for the Fund including, (i) communicating with the Fund's Shareholders (ii) processing subscriptions of Shareholders (iii) receiving and advising the Fund Manager of redemption requests from Shareholders (iv) maintaining the share register of the Fund and (v) calculating the Net Asset Value of the Shares. The Administrator will also serve as administrator of the Master Fund.

**Prime Broker/ Custodian**  Lek Securities Corporation will provide custody services for the Fund. Lek Securities Corporation are members of the New York Stock Exchange, the American Stock Exchange, the Chicago Stock Exchange, the Philadelphia Stock Exchange, the Boston Stock Exchange, the Pacific Stock Exchange, the International Securities Exchange, the Chicago Board Options Exchange, the National Association of Securities Dealers, the National Futures Association, the Depository Trust Clearing Corporation, the Option Clearing Corporation , the Stock Clearing Corporation of Philadelphia and the

Securities Investors Protection Corporation. Lek Securities Corporation will also serve as custodian of the Master Fund.

**Auditor**   The Fund's and the Master Fund's auditors are Deloitte, British Virgin Islands.

**Directors**   The Fund is governed by its Board of Directors which consists of a sole director, Fiduciary Group Limited, which is an affiliate of the Administrator. Fiduciary Group Limited will also act as sole director of the Master Fund.

**Business of the Fund**   The Fund allocates its assets through multiple Managers utilizing a series of Segregated Portfolios. The Managers of the Segregated Portfolios and the allocations to such Managers vary from time to time. The Managers trade securities and other financial instruments, including common stocks, preferred stocks, corporate bonds, convertible bonds, U.S. government securities, warrants, currencies, listed and unlisted options, futures contracts and options on futures contracts.   Each Manager or group of Managers will have a separate Segregated Portfolio.   Investors in the Fund may allocate their subscriptions to one particular Segregated Portfolio or they may choose several Segregated Portfolios. You may request additional information regarding the Underlying Investments or their respective Managers that outlines the merits and risks associated with investments in the Segregated Portfolios, by contacting the Fund Manager.

**Master Feeder Structure**   The Fund will employ a "master feeder" structure pursuant to which the Fund will pool its assets with Last Atlantis Partners, LLC (the "Onshore Fund"), a Delaware series limited liability company established by the Fund Manager for the benefit of U.S. domiciled investors. The assets of the Fund and the Onshore Fund will be invested in the Master Fund. The Master Fund is recognized as a private fund under the Mutual Funds Act 1996, as amended.  The Master Fund will make the direct investments in accordance with the Fund Manager's investment strategy. However, the Fund maintains the flexibility to engage in direct trading activities in some circumstances. It is also possible that the Master Fund may permit other feeders to invest in the Master Fund, provided, however, that doing so does not alter the rights or the level of risk enjoyed by the Fund.

The master feeder structure, in particular the existence of multiple investment vehicles investing in the same portfolio, presents certain unique risks to the investors.  The assets of the Fund could potentially be exposed to the creditors of the Master Fund in addition to the Fund's own creditors. Smaller investment vehicles investing in the Master Fund may be materially affected by the actions of the larger investment

vehicles investing in the Master Fund; the remaining investment vehicles may experience higher pro rata operating expenses, thereby producing lower returns.

The Fund, the Offshore Fund, and the Master Fund are structured such that the debts or liabilities are not exposed to any other Segregated Portfolios. The rights of each Shareholder in the Master Fund will be protected in the Master Fund through the use of a segregated portfolio company structure, which isolates the assets, rights, and obligations of each Segregated Portfolio's investment, into protected cells.

**Cross Liability**

The segregated portfolio company structure insulates an individual Segregated Portfolio from cross liability with other Segregated Portfolios. Except as otherwise provided for in the Memorandum and Articles of Association, debts, obligations, and liabilities of a class of shares, whether arising in contract tortes, or otherwise, shall be solely the debts, obligations and liabilities of such Segregated Portfolio.

**Fund Objective**

The Fund seeks to provide investors with a superior long-term risk-adjusted rate of return. The Fund Manager believes that it can best serve its investor base by providing a wide variety of alternative investments in a multi-Segregated Portfolio structure. The Fund thus seeks to achieve an above average rate of return without the volatility and risk generally associated with traditional portfolios. The Fund Manager has similar objectives for the Master Fund.

The investment strategy of the Fund Manager is a talent-driven process. The Fund Manager believes there are talented investment managers available who are able to generate above-average returns with less volatility than a traditional portfolio. The Fund Manager believes these managers can be initially identified using a proprietary process to statistically analyze their performance for return, return-to-risk, and consistency characteristics. The second step in the process is a qualitative evaluation of the management firm for issues such as integrity, business skills, trading methodology, and risk management. The next step in the investment process is to build client portfolios or investment products around desired return and risk characteristics. The final step in the process is ongoing management of a portfolio. Again, standards are developed to evaluate the performance of a manager selected on behalf of the Fund by the Fund Manager. A combination of early warning indicators and required termination criteria are used to manage the ongoing risk and performance of a portfolio.

The Fund Manager monitors the performance and degree of performance correlation among both existing and prospective managers. The Fund Manager maintains a database of securities, futures and derivatives managers, and evaluates managers on the basis of their performance histories, trading methodologies, market concentration and

diversification potential as reflected in the relative lack of correlation among their trading results. Also considered are the manager's reputation, integrity, and trading psychology as well as its overall trading skill, money management, and the total amount of funds under management. Ultimately, a final determination to include a manager in the Fund is made subjectively by the Fund Manager applying some or all of the foregoing criteria.

The Fund Manager expects that the Managers of the various Segregated Portfolios will trade a wide variety of financial instruments in various markets. Such instruments are likely to include equities, debt instruments, swaps on interest rates and currencies, futures contracts on equity indices, interest rate instruments, currencies and physical commodities, options on any of the foregoing, and inter-bank currency contracts. The markets traded by the Managers are likely to include worldwide stock, options and futures exchanges, over-the-counter (dealer) markets, and privately negotiated transactions. Some of the instruments traded by the Managers may be inherently leveraged, such as options and futures, while some Segregated Portfolios may obtain non-recourse leverage through outside borrowing.

*While the use of borrowed funds can substantially improve the return on invested capital, their use may also increase any adverse impact to which the Segregated Portfolio investment may be subject.*

*The Fund is designed for long-term investors who do not require current investment returns or current liquidity. As with any investment, there can be no assurance that the Fund's investment objective will be achieved or that an investor will not lose a portion or all of his investment in the Fund.*

## The Offering

**Shares Being Offered**

Shares of the Fund are offered on a continuous basis to non-U.S. Persons (as defined in the Fund's Subscription Agreement), and by U.S. investors that are exempt from U.S. federal income tax. The Fund may in its discretion admit taxable U.S. Persons (as defined in this Memorandum Offerings to U.S. tax-exempt investors are being offered in accordance with Section 4(2) of the Securities Act and Rule 506 of Regulation D thereunder to "accredited investors" who are also "qualified purchasers" under the Investment Company Act of 1940.

Shares of each Segregated Portfolio in the Fund will be issued at an initial subscription price of US$1,000 per Share during the initial offer period which will begin on the date the Fund is approved by the British Virgin Islands Financial Services Commission to commence its

business as a mutual fund and ending on March 31, 2007. Thereafter, Shares of the Fund will generally be offered on the first calendar day of each month or on a more or less frequent basis as the Fund Manager determines. The minimum initial subscription by each subscriber is US$1,000,000, although the Fund Manager may, in its discretion, permit subscribers to make an initial subscription of less than US$1,000,000. Upon the acceptance by the Fund Manager of an investor's first subscription for Shares, such investor will become a member of the subscribed Segregated Portfolio of the Fund. The Fund Manager may, in its discretion, reject any subscription in whole or in part, for any or no reason, and may terminate this offering at any time.

**Eligible Investors**   A subscriber to any Segregated Portfolio of the Fund must be a Professional Investor. A professional investor is a person (a) whose ordinary business involves, whether for its own account or the accounts of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property of the fund or (b) who has signed a declaration that he, whether individually or jointly with his spouse has net worth in excess of US$1,000,000 or its equivalent in any other currency and that he consent to being treated as a professional investor.

A US Subscriber to any Segregated Portfolio of the Fund of which the Commodity Futures Trading Commission ("CFTC") is not the regulatory authority must be an "Accredited Investor" as defined below by the Securities and Exchange Commission ("SEC"). A US Subscriber to any Segregated Portfolio of the Fund of which the CFTC is the regulatory authority must be a "Qualified Eligible Participant" ("QEP") as defined below by the CFTC.

*Accredited Investor.* The Subscriber is an "accredited investor" because the Subscriber is:

- a natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his or her purchase exceeds $1,000,000.

- a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that reasonable expectation of reaching the same income level in the current year.

- an organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000.

- a bank as defined in Section 3(a)(2) of the Securities Act, or a

savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity; a broker-dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended (the "Securities Exchange Act"); an insurance company as defined in Section 2(13) of the Securities Act; an investment company registered under the Investment Company Act of 1940, as amended (the "Investment Company Act"), or a business development company as defined in Section 2(a)(48) of the Investment Company Act; a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; a plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000, or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors.

- a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, as amended (the "Investment Advisers Act").

- a director, executive officer, or managing member of the issuer of the securities being offered or sold; or a director, executive officer, or managing member of the Fund Manager managing that issuer.

- a trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D promulgated by the Securities and Exchange Commission under the Securities Act.

- an entity in which all of the equity owners are accredited investors (as defined above).

*Qualified Eligible Participant.* The Subscriber is a "qualified eligible participant" ("QEP") within the meaning of Commodity Futures Trading Commission ("CFTC") Rule 4.7 under the Commodity Exchange Act because the Subscriber:

- owns securities of issuers not affiliated with Subscriber (including the Fund) and other investments with an aggregate market value of at least $2,000,000 and is an "accredited investor".

- is a person, acting for its own account or for the account of a QEP, who is:

  o a "futures commission merchant" registered pursuant to Section 4d of the Commodity Exchange Act;

  o a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act;

  o a registered commodity pool operator who has been registered and active as such for two years or who operates pools which, in the aggregate, have total assets in excess of $5,000,000;

  o a registered commodity trading adviser who has been registered and active as such for two years or who provides commodity interest trading advice to commodity accounts which, in the aggregate, have total assets in excess of $5,000,000;

  o a commodity pool operator and the commodity trading adviser of the Fund.

- is not a "United States person." For this purpose, "United States" means the United States, its states, territories or possessions, or an enclave of the United States government, its agencies or instrumentalities, and a person is not a "United States person" if such person is:

  o a natural person who is not a resident of the United States;

  o partnership, corporation or other entity organized principally for passive investment, organized under the laws of a foreign jurisdiction and which has its principal places of business in a foreign jurisdiction;

  o an estate or trust, the income of which is not subject to United States income tax regardless of source;

  o an entity organized principally for passive investment such as a pool, investment company or other similar entity provided that units of participation in the entity held by United States persons represent in the aggregate

less than 10% of the beneficial interests in the entity, and that such entity was not formed principally for the purpose of facilitating investment by United States persons in a pool with respect to which the operator is exempt from certain requirements of Part 4 of the CFTC's regulations by virtue of its participants not being United States persons; or

- a pension plan for the employees, officers, or principals of an entity organized and with its principal place of business outside the United States.

- is an employee benefit plan within the meaning of ERISA:

  o the investment decision of which are made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company, or registered investment adviser;

  o with total assets in excess of $5,000,000;

  o if a self-directed plan, with investment decisions made solely by persons that are QEPs.

- is a plan established and maintained by a state, a political subdivision thereof or an agency or instrumentality thereof, for the benefit of its employees, with total assets in excess of $5,000,000.

- is an entity in which all of the unit holders or participants are QEPs.

**Subscription Terms and Procedure**

The Subscription Agreement of the Fund describes the procedure for subscribing for Shares of the Fund. In order for your subscription to become effective as of the date intended by you, your subscription and a completed Subscription Agreement must be received by the Administrator ten (10) days before the first calendar day of the month for the Administrator, at its discretion, to process the subscription and the Subscription Agreement. All subscription funds will be deposited in a bank account established by the Administrator in the name of the specific Segregated Portfolio. Subscription funds that are not accepted will be returned to you within fifteen (15) days of being rejected by the Administrator.

In order to subscribe for Shares, each prospective investor will be required to deliver to the Administrator a fully executed and

appropriately completed copy of the Fund's Subscription Agreement.. The Subscription Agreement includes certain representations by the prospective investor with respect to the prospective investor's subscription and requests information necessary for the Administrator to determine whether the prospective investor is qualified under applicable securities laws and regulations to invest in the Shares. Accompanying this Memorandum are copies of the Memorandum and Articles of Association and Subscription Agreement.

The amount to be invested must be delivered by wire transfer and received no later than ten (10) days before the first day of the month. The Administrator will supply each investor with wire transfer instructions upon its acceptance of each Subscription Agreement.

**Fund Manager Capital Contribution**

The Fund Manager and its principals are not required to subscribe to the Shares of the Fund; however, the principals and key staff of the Fund Manager intend to invest a significant portion of their net worth in the Fund.

## Investor Liquidity

**Redemptions**

You generally may redeem any or all of your investment from the Segregated Portfolio in which you invested based on the redemption policies for that Segregated Portfolio. Your withdrawal right is subject to the Fund's ability to in turn withdraw sufficient capital from the Underlying Investments.

*Certain Underlying Investments may have redemption/withdrawal policies (for example, substantial "lockup" periods or redemptions/withdrawals only at year-end) that prevent the Fund from honoring your redemption request on a timely basis. The Fund Manager may be contacted for more information regarding the redemption policies of the specific Segregated Portfolio.*

Certain Underlying Investments may impose a redemption/withdrawal charge to the Fund. Any redemption/withdrawal charges incurred by the Fund as a result of redemption/withdrawal requests will be borne by the redeeming Segregated Portfolio Member. When practicable, the Fund Manager will notify the redeeming Member of any redemption/withdrawal charges to be assessed.

No Segregated Portfolio Member may make a redemption, other than a complete redemption that reduces a Member's investment balance below the minimum initial subscription amount; however, the Fund Manager may, in its sole discretion, waive minimum investment balances with respect to certain Members or under certain circumstances. The Fund Manager may require that any Member

redeem/withdraw all or any portion of its investment for any reason without notice.

***Please review the Memorandum and Articles of Association for additional limitations on your right to redeem.***

***Certain Underlying Investments may become HIGHLY ILLIQUID making it impossible for the Fund to honor its redemption policies.***

**Redemption Proceeds**

In general, at least 90% of your redemption proceeds will be paid to you within forty-five days after the effective date of your redemption. Any balance will be paid within 30 days after the completion of the Fund's annual audit for the relevant year.

**Redemption Rights**

As indicated above, the Fund Manager has discretion to suspend your redemption right if and to the extent the Fund:

a) is unable to withdraw sufficient capital from the Underlying Investments to honor the redemption request;

b) is able to withdraw its capital but the redemption would have a material adverse effect on the remaining investors. Any amounts subject to suspended redemption rights shall continue to participate in the Fund's profits and losses.

**Distributions**

The Fund Manager does not intend to make distributions of Fund profits to the investors in the Fund.

**Transfers of Interests**

You may transfer or pledge your Shares only in the Fund Manager's discretion and subject to all legal or regulatory restrictions.

**Determination Of Net Asset Value**

The Net Asset Value of a Segregated Portfolio of the Fund and the Master Fund shall be calculated on a Valuation Day by the Administrator and under the general supervision of the Directors. The Net Asset Value of a Segregated Portfolio is determined by deducting the total liabilities, including all accrued liabilities, attributable to that Segregated Portfolio from the aggregate value of the Segregated Portfolio Assets of that Segregated Portfolio.

The Net Asset Value per Share of a Segregated Portfolio is determined by dividing the Net Asset Value of the Segregated Portfolio by the number of Segregated Portfolio Shares in issue in respect of that Segregated Portfolio calculated to two decimal places.

**Fees and Expenses**

**Fund
Expenses**

The Fund's expenses include organizational, offering, administrative, auditing, accounting, regulatory and legal. The organizational and offering expenses of the Fund and the Master Fund were advanced by the Fund Manager and will be repaid at a later date.

**Segregated Portfolio
Expenses**

The main expenses for each Segregated Portfolio are expected to be the Underlying Asset Management Fee and the Underlying Performance Fee paid to the Underlying Managers of the Segregated Portfolios, brokerage commissions, transaction costs, start-up expenses, and administrative costs such as audit and legal fees. The Underlying Asset Management Fees are expected to range between zero to two percent (0%-2%) per annum of the Segregated Portfolio assets payable monthly in advance, and Underlying Asset Performance Fees between zero and fifty percent (0%-50%) of profits, payable monthly in arrears, although these fees may be lower or higher in certain circumstances. Most Segregated Portfolios are expected to assess Performance Fees solely on High Water Mark ("High Water Mark") profits, so that losses are carried forward and must be recouped out of future profits before a Performance Fee can be earned in a later period. Some Segregated Portfolios, however, may assess Performance Fees on "period-to-period" profits, under which losses are not carried forward. Additionally, any Segregated Portfolio that has multiple Managers may have to pay a Performance Fee to the profitable Managers, while the Segregated Portfolio as a whole experiences a loss. This would result if the Performance Fee(s) paid and/or expenses of the Segregated Portfolio exceed the cumulative profits of the profitable Managers. The Fund Manager reserves the right to make certain payments to broker-dealers and/or sales agents who assist in the distribution of the Shares. The payments are expected to range between zero and ten percent (0-10%) of the investment and will be amortized over the lock-up period.

**Fund Asset
Management Fee**

For the Fund Manager's services, the Fund will pay the Fund Manager a monthly Asset Management Fee ("Asset Management Fee") payable within ten days after the end of each calendar month equal to one twelfth of one percent (1/12 of 1%) of the Fund's net asset value as of the first day of each calendar month including any subscriptions effective as of such date. The Fund Manager, in its sole discretion, may assess a higher or lower Asset Management Fee with respect to certain Segregated Portfolio Members upon their admission to the Fund. The Fund Manager may use the Asset Management Fee in whole or in part to compensate certain persons and/or firms that solicit and refer their clients to the Fund Manager for participation as Shareholders in the Fund.

**Fund Performance Fee**

The Fund Manager's Performance Fee ("Performance Fee") is calculated separately with respect to each Segregated Portfolio Member's Capital Account ("Capital Account") as of the end of each calendar month or when all or a portion of a Capital Account is redeemed, with respect to the balance redeemed, on a High Water Mark basis so that losses are carried forward and must be recouped out of future profits before a Performance Fee can be earned in a later period. The Performance Fee, with respect to each Capital Account, equals ten percent (10%) of any increase in the cumulative Trading Profits ("Trading Profits") that exceed the previous High Water Mark as of any previous calendar month-end or no fee, if the Capital Account has been unprofitable. Trading Profits are calculated after subtraction of the Fund Manager Asset Management Fees, execution fees, brokerage commissions, administrative expenses, and Underlying Investment Manager fees. The Fund Manager may use the Performance Fee in whole or in part to compensate certain persons and/or firms that solicit and refer their clients to the Fund Manager for participation as Shareholders in the Fund.

The fees of the Fund Manager in relation to the Master Fund will be calculated on similar terms.

**Administrators' Fees**

The fees payable to the Administrator are based on its standard schedule of fees charged by the Administrator for similar services. The fees of the Administrator will be paid by the Fund.

**Custodians Fees**

Fees payable to Lek Securities for its services as custodian of the Fund and the Master Fund are currently limited to brokerage commissions earned in the ordinary course of providing execution services.

## Reporting

**Reports**

You will receive monthly updates of your Segregated Portfolio's performance, and audited annual financial statements. Because the Fund will be unable to issue its year-end audited statements until it receives year-end statements from each Manager or Underlying Investment, the Fund is likely to issue its annual financial statements approximately one hundred and twenty (120) days after the end of each calendar year.

**Segregated Portfolios**

The Fund is a company limited by shares structured as a segregated portfolio company under the laws of the British Virgin Islands with multiple Segregated Portfolios. Under British Virgin Islands' law, each Segregated Portfolio is insulated from cross-liability with other Segregated Portfolios. Each Segregated Portfolio will access the corresponding Manager(s) with an investment directly with the Manager or through a fund traded by the Manager. Certain Segregated Portfolios will be managed by LACM, while other Segregated Portfolios will invest with outside Managers. The following is a brief description of the different Segregated Portfolios authorised by the Fund. The Master Fund is authorised to issue the same Segregated Portfolios with corresponding investment objectives and redemption terms.

For additional information regarding the Segregated Portfolio or their respective Managers, including the merits and risks associated with investments in the Segregated Portfolios, please contact the Fund Manager.

## LACM Split Strike Conversion Segregated Portfolio A-2

**Segregated Portfolio A-2**

The LACM Split Strike Conversion Segregated Portfolio A-2 Portfolio is designed as an alternative to traditional fixed income and equity investments. The Underlying Investment Manager utilizes a strategy that has delivered consistent returns through all market cycles, and has demonstrated an ability to manage volatility through the use of hedged strategies.

The Underlying Investment Manager will invest in a basket of OEX stocks hedged with OEX options. The strategy is called "split-strike conversion" and entails: (i) purchasing a basket of thirty to forty large capitalization S&P 100 stocks, which together account for the greatest weight of the Index and therefore, when combined, present a high degree of correlation with the general market; (ii) selling out-of-the-money S&P 100 Index call options representing a dollar amount of the underlying Index equivalent to the dollar amount of the basket of shares purchased; (iii) purchasing out-of-the-money or at-the-money S&P Index put options in the same dollar amount. At certain times when the Manager has no positions in place, the funds will be invested into T-bills.

Through the use of non-recourse financing, for each US$1.00 invested the investor will receive approximately US$3.00 of exposure to the strategy with no liability beyond their initial investment.

LACM will access this program either through a managed account or through an investment into a fund.

| | |
|---|---|
| Non-recourse Leverage: | US $2.00 for every US $1.00 allocated |
| Underlying Investment Asset Management Fee: | 1% per Annum |
| Underlying Investment Performance Fee: | 10% |
| Redemptions: | Monthly |
| Redemption Notice: | 60 Days |

### LACM Enhanced Multi-Strategy Segregated Portfolio M

**Segregated Portfolio M**

LACM Enhanced Multi-Strategy Portfolio, Segregated Portfolio M incorporates a diversified blend of professional hedge fund managers and alternative investments (approximately 30) encompassing a broad range of hedge fund strategies (currently 8) to deliver non-correlated returns focused on capital preservation, low annualized volatility (Standard Deviation), and a Sharpe Ratio greater than +2.

The Underlying Investment Manager will create a proprietary methodology for evaluating, developing and incorporating new strategies into the Segregated Portfolio' tailored portfolio.

The Manager initially evaluates each new strategy based on its concept, performance, and its relative volatility and liquidity levels. The Manager then determines how adding a strategy will affect overall portfolio performance, how it performs within the portfolio's overall risk parameters, how it helps diversify risk or capture new revenue streams, and how it may increase Segregated Portfolio capacity.

Finally, once the strategy evaluation is complete, the Manager proceeds with an extensive evaluation process that incorporates a top-down and bottom-up analysis of the strategy's manager.

Once a strategy is incorporated into the portfolio, its performance is continually monitored. Any strategy may be considered for elimination from the portfolio if it fails to perform for three consecutive months. The Manager may also reintroduce previously used strategies into the portfolio if they start performing again.

The current strategies employed include: fixed income arbitrage, multi-strategy arbitrage, mortgage-backed arbitrage, long/short equity, global macro, high yield, multi-strategy, emerging markets, and event-driven.

The Manager will further employ non-recourse leverage across this custom-tailored blend to increase returns while maintaining an acceptable level of monthly and annual volatility. For each $1.00 invested the investor will receive approximately $3.50 to $5.00 of exposure to the strategy with no liability beyond their initial investment.

LACM will access this program either through a managed account or investments into funds.

Non-recourse Leverage:                          US$2.50 to US$4.00
for every US$1.00 allocated

Underlying Investment Asset Management Fee:

1% per Annum

| | |
|---|---|
| Underlying Investment Performance Fee: | 10% |
| Redemptions: | Quarterly |
| Redemption Notice: | 90 days |

**LACM Enhanced Multi-Strategy Segregated Portfolio ML**

**Segregated Portfolio ML**    LACM Total Diversified Portfolio, Segregated Portfolio ML incorporates a extensive blend of professional hedge fund managers and alternative investments to deliver non-correlated returns focused on capital preservation and low annualized volatility (standard deviation), and a Sharpe Ratio greater than +2.

Last Atlantis has created a proprietary methodology to develop the tailored portfolio components including the evaluation protocol that incorporates a top-down and bottom-up manager analysis.

The current styles employed within Enhanced Multi-Strategy Segregated Portfolio ML include: split-strike conversion, high-yield, multi-strategy, discretionary global macro, trend following futures, discretionary short-term futures, proprietary options, and discretionary options.

Non-recourse Leverage:        Not Applicable
Underlying Investment Asset Management Fee: 1% per Annum

Underlying Investment Performance Fee:    10%
Redemptions:                    Quarterly

Redemption              Notice: 100 Days
Lock-up                    24 Months
0-12 months              No redemption
13-18 months              3% penalty
18-24 months              2% penalty

**LACM Total Diversified Segregated Portfolio T**

**Segregated Portfolio T**   LACM Total Diversified Portfolio, Segregated Portfolio T incorporates an extensive blend of professional hedge fund managers and alternative investments to deliver non-correlated returns focused on capital preservation, low annualized  volatility (standard deviation), and a Sharpe Ratio greater than +2.

Last Atlantis has created a proprietary methodology to develop the tailored portfolio components including the evaluation protocol that incorporates a top-down and bottom-up manager analysis.

The current styles employed within Total Diversified include: split-strike conversion, high-yield, multi-strategy, discretionary global macro, trend following futures, discretionary short-term futures, proprietary options, and discretionary options.

Non-recourse Leverage:   Not Applicable
Underlying Investment Asset Management Fee: 1% per Annum
Underlying Investment Performance Fee:  10%
Redemptions:     Quarterly
Redemption Notice:    100 Days

**Risk Factors**

There are various substantial risks associated with an investment in the Fund. There are many market-related and other factors - some of which cannot be anticipated - that could cause an investor to lose a major portion or all of its investment in the Fund, prevent the Fund from generating profits, or reduce or eradicate an investor's after-tax return on its investment. No person(s) should invest in the Fund unless it is fully able, financially and otherwise, to bear such a loss, and unless it has the background and experience to understand thoroughly the risks of its investment. This and other sections of this Memorandum identify some of the risks of investing in the Fund, but this Memorandum does not attempt to identify each risk, or to describe completely or substantially those risks it does identify.

***The following investment risk factors are presented for illustrative purposes only and do not purport to be a comprehensive delineation of the risks pertaining to investment strategies that may be employed by the Managers in their Segregated Portfolios.***

The Fund's multi-Manager, Segregated Portfolio structure generally presents three general types of risk - Market risk: the deterioration of an entire market, such that most or all Managers concentrating in the market incur large losses; Strategy risk: the deterioration of an entire investment strategy; Manager risk: loss due to Manager fraud, deviations from a defined strategy, human or system error, or poor judgment.

**Market Risk**        ***Economic Conditions***   The success of any investment activity is affected by general economic conditions, which may affect the level and volatility of interest rates and the extent and timing of investor participation in the equities and interest-rate markets. Unexpected volatility or illiquidity in the markets in which the Managers hold positions could impair their ability to carry out their business or cause them to incur losses.

                              ***Suspensions of Trading***   Securities and commodities exchanges typically can suspend or limit trading in any instrument traded on the exchange. A suspension could render it impossible for a Manager to liquidate positions and thereby expose the Segregated Portfolio to substantial losses.

                              ***Lack of Liquidity***  Despite the heavy volume of trading in securities and other financial instruments, the markets for some instruments have limited liquidity and depth. This could be a disadvantage to the Manager, both in the realization of the prices that are quoted and in the execution of orders at desired prices.

**Strategy Risk**       ***Non-Diversification and Sector Concentration***   The Managers may have overlapping strategies and thus could accumulate large positions in the same or related instruments without the Fund Manager's knowledge. However, even if known, the Fund Manager's ability to avoid such concentration would depend on the Fund Manager's ability to reallocate the Fund's capital among existing or new Managers, which might not be feasible for several months until redemptions and

contributions are permitted by the Underlying Investments. Non-diversification among Managers involves an increased risk of loss to the Segregated Portfolio if the market value of a security should decline. Moreover, when a Manager concentrates its investments in a market sector, financial, economic, business, and other developments affecting issuers in that sector will have a greater effect on the Segregated Portfolio than if it had not concentrated its assets in that sector.

***Portfolio Turnover***   Many of the investment strategies employed by Managers are expected to lead to frequent changes in the investment portfolio.   High portfolio turnover will result in higher expenses, principally higher brokerage commissions, dealer mark-ups, and other transaction costs on the sale of securities and reinvestment in other securities.   High portfolio turnover also results in more rapid realization of taxable gains and losses.

***Leverage***   The Shares of the Segregated Portfolios will invest in some Underlying Investments that may use leverage in their investing, which would increase any loss incurred as well as transaction expenses. When a Manager borrows money for leverage and its investments increase or decrease in value, the Segregated Portfolios Net Asset Value (NAV) will increase or decrease more (possibly by multiples, depending upon the degree of leverage employed at such time) than if it had not borrowed money. Managers employing arbitrage type strategies may use particularly large amounts of leverage, which could result in large losses if market factors impair the hedged nature of their positions.

***Hedging and Arbitrage***   The use by some Managers of hedged or arbitrage strategies does not necessarily mean these strategies are relatively low risk.  Substantial losses may be recognized on hedge or arbitrage positions, and illiquidity and default on one side of a position can effectively result in the position being transformed into an outright speculation.  Every hedge or arbitrage strategy likely involves exposure to some second order risk of the markets, such as the implied volatility in convertible bonds or warrants, the yield spread between similar term government bonds or the price spread between different classes of stock for the same issuer.  Further, there are few examples of pure hedge or arbitrage Managers. Many such Managers probably employ limited directional strategies which expose them to market risk.

***Short Selling***   Some Managers may sell securities short, which exposes the seller to theoretically unlimited risk due to the lack of an upper limit on the price to which the security may rise.  Short selling also involves the sale of borrowed stock, and thus if the stock loan is called the short seller may be forced to repurchase the stock at a loss. In addition, some Managers may attempt to profit by forcing short sellers to incur a loss, or may make large purchases of a stock that has been sold short with the intent to drive up the stock price and cause the short sellers to incur losses.  Such Managers hope the short sellers will limit their losses by

repurchasing the stock and thus force the stock price even higher.

**Convertible Securities**   Some Managers may invest in convertible securities, including non-investment grade convertible securities.  A convertible security (a bond or preferred stock) may be converted at a stated price within a specified period of time into a certain quantity of the common stock of the same or a different issuer.  Convertible securities are senior to common stock in an issuer's capital structure, but are usually subordinated to similar non-convertible securities.  While providing a fixed income stream (generally higher in yield than the income from common stocks but lower than that afforded by a similar non-convertible security), a convertible security also affords an investor the opportunity, through its conversion feature, to participate in the capital appreciation of the issuer's common stock.

**Private Placements**   Some Managers may invest in privately issued securities that are subject to legal or contractual resale restrictions.  Managers may be unable to publicly sell these securities unless they are registered under applicable securities laws, or unless a registration exemption is available.  Such securities are also typically difficult to value.  For these reasons, disposition of privately issued securities may be difficult and may require a lengthy period of time.  Moreover, the issuers of such securities typically are early stage companies that may lack management depth and sufficient financial resources, which may be marketing a new product for which there is no established market, or which may be subject to intense competition from larger, more established companies.

**Derivatives**   Various Managers may use derivatives, such as options, futures, and swaps.  The derivatives market is, in general, a relatively new market and there are uncertainties as to how it will perform during periods of unusual price volatility or instability, market illiquidity or credit distress. Substantial risks are also involved in borrowing and lending against derivatives.  Derivatives prices can be volatile, market movements are difficult to predict and financing sources and related interest rates are subject to rapid change. One or more markets may move against the derivatives positions held by a Manager, thereby causing substantial losses.  Most of these instruments are not traded on exchanges but rather through an informal network of banks and dealers who have no obligation to make markets in them and can apply essentially discretionary margin and credit requirements, and thus, force a Manager to close out positions.  In addition, some derivatives carry the additional risk of failure to perform by the counterparty to the transaction. Many unforeseeable events, such as government policies, can have profound effects on interest and exchange rates, which in turn can have large and sudden effects on prices of derivative instruments.

**Futures**   Commodity futures prices can be highly volatile.  Because of

the low margin deposits normally required in futures trading, an extremely high degree of leverage is typical of a futures trading account. As a result, a relatively small price movement in a futures contract may result in substantial losses to the trader. Like other leveraged investments, futures transactions may result in losses in excess of the amount invested.

**Manager Risk**    ***Dependence on Skill and Integrity of Managers***  The success of the Fund is dependent upon the ability and integrity of the Managers and the Underlying Investments selected by the Fund Manager.  While the Fund Manager carefully scrutinizes new Managers and monitors all Underlying Investments in which the Fund invests, the current and future performance of any individual Segregated Portfolio may vary from its historical performance.  In addition, there is the possibility that Managers may deviate from their stated investment disciplines, be negligent in their investment management or commit fraud or willful misconduct.

***Key Principals of The Managers***  The Managers are likely to be dependent on the services of one or a few individuals. The loss (through death, disability, retirement or leaving the employ of a Manager) of a key principal's services could cause the Fund to incur losses.  Major life stresses, such as divorce or death of a loved one, can have a profound effect on the performance of a key principal.

***Litigation Risk***  A Manager could become involved in shareholder, insider trading or other litigation as a result of its investment activities, which could adversely affect the Segregated Portfolio.

***Conflicts of Interest***  The Fund and the Fund Manager could be subject to various conflicts of interest, which could be resolved to the detriment of the Fund.  For example, a Manager might favor its proprietary trading over its trading for the Segregated Portfolio.

***Increase in Managed Assets***  The Fund may invest with Managers who are experiencing a major increase in the assets they manage, which may impair the ability of their strategies and operations to perform up to historical levels. Additionally, Managers faced with a significant increase in assets to invest may divert from stated strategies into strategies or markets with which they could have little or no experience. This could result in serious losses to the Fund and, accordingly, the relevant Segregated Portfolio(s).

***New Strategies***  Some of the strategies used by the Managers may not have been in existence during periods of major market stress, disruption or decline. As a result, it is not known how these strategies will perform in these periods.

**Lack of Operating
History**              Although the Fund has no operating history by which investors may
                       evaluate the potential performance of the Fund, the managing principals
                       of the Fund Manager have extensive industry experience operating
                       similar alternative investment programs.

**Fund Structure
Risk**                 *Passive Investment*  The Fund will be managed exclusively by the Fund
                       Manager; Shareholders will not be able to make any investment or other
                       decisions on behalf of the Fund.  Shareholders are in fact precluded
                       from active participation in making investment or other management
                       decisions.  In order to safeguard their limited exposure to the Fund's
                       liabilities, Shareholders must rely on the Fund Manager to manage and
                       conduct the affairs of the Fund.

                       *Reliance on Key Personnel*  The success of the Fund is highly
                       dependent on the financial, managerial and investment expertise of key
                       personnel of the Fund Manager.  Should anything happen to such key
                       personnel, the business and results of operations of the Fund may be
                       adversely affected.

                       *Multiple Managers*  Because each Manager will trade independently of
                       the others, the trading losses of some Managers could offset trading
                       profits achieved by the profitable Managers.  The profitable Managers
                       would earn incentive fees even though the Fund as a whole may not be
                       profitable.  Managers might compete for the same investment positions.
                       Conversely, Managers may take offsetting positions that would result in
                       transaction costs for the Fund without the possibility of profits.

                       *Manager or Allocation Changes*  The Fund Manager expects from time
                       to time to change Managers and the asset allocations among Segregated
                       Portfolios. The Fund Manager is not required to notify investors of such
                       changes.  These changes may occur when the Fund receives additional
                       subscriptions from investors at a time when certain Segregated
                       Portfolios are "closed" to new investment.  The new capital would thus
                       have to be allocated to "open" Segregated Portfolios, which may affect
                       asset allocation in an unintended way.  The Fund's success will depend
                       on the Manager selection and allocation abilities of the Fund Manager,
                       which are untested.

                       *No Public Market for Interests*  Although Shares in the Fund may be
                       redeemed on a periodic basis, Shares may not be assigned, pledged or
                       transferred without the prior written consent of the Fund Manager or the
                       directors of the Fund. There is no market for the Shares and none is
                       expected to develop.  The Shares will not be registered under the
                       Securities Act or any other securities law and will be subject to strict
                       restrictions on resale and transferability under such laws and the
                       Memorandum and Articles of Association.

***Underlying Investments Limitations on Redemptions*** While investors in the Fund have certain redemption rights, the Underlying Investments may not permit redemptions/withdrawals at the same intervals or on the same notice. For this reason, the Fund Manager or the directors have authority to restrict investors' redemption rights, on a pari passu basis among all investors, if and to the extent the Fund is unable to obtain sufficient funds to honor redemption requests by redeeming from the Underlying Investments, through borrowings, or otherwise. Thus, investors requesting a redemption may potentially experience major delays in receiving redemption payments.

***Institutional Risk*** The Fund could incur major losses due to the financial difficulty of the brokerage firm, bank or other custodian with which it deposits its assets. The Fund will have no control over the depositories or financial intermediaries used by the Managers.

***Management Agreement*** The Management Agreement between the Fund and the Fund Manager provides that the Fund Manager, its affiliates, and its directors, governors, shareholders, members, partners, officers, employees and agents, will not be liable to any Shareholder or the Fund for honest mistakes of judgment, acts or omissions done or made in good faith for a purpose reasonably believed to be in the best interests of the Fund; the negligence, dishonesty or bad faith of any employee, broker or other agent of the Fund; or acts or omissions done or made in accordance with the advice or opinion of counsel or accountants. However, these provisions will not relieve any such person of any liability for acts or omissions of such person which a court finds to be the result of the gross negligence, recklessness or intentional wrongfulness of such person or if the court determines that applicable law prevents exculpation. The Management Agreement provides that a loss from an investment made and managed by the Fund Manager in the good faith exercise of its reasonable business judgment will not constitute gross negligence, recklessness or intentional wrongfulness or prevent exculpation.

The Management Agreement also provides that the Fund will indemnify the Fund Manager, its affiliates, and its directors, governors, shareholders, members, partners, officers, employees and agents, for damages, settlements, fees, and expenses arising from claims and actions relating to the Fund or its affairs; however, indemnification will not extend to the conduct of an indemnified person that a court finds to be the result of the gross negligence, recklessness, or intentional wrongfulness of such indemnified person or if the court determines that applicable law prevents indemnification. Expenses incurred by any indemnified party in defending an eligible claim or proceeding will be paid by the Fund in advance of the final disposition of such claim or proceeding provided the party undertakes

to repay such amount if it is ultimately determined that the party was not entitled to be indemnified by the Fund.

***Master Feeder Structure*** The master feeder structure, in particular, the existence of multiple investment vehicles investing in the same portfolio presents certain unique risks to investors. Smaller investment vehicles investing in the Master Fund may be materially affected by the actions of the larger investment vehicles investing in the Master Fund; the remaining investment vehicles may experience higher pro rata operating expenses, thereby producing lower returns. The assets of the Fund could potentially be exposed to the creditors of the Master Fund, in addition to the Fund's own creditors.

## Conflicts Of Interest

The Fund Manager and its affiliates may be subject to various conflicts of interest in their relationships with the Fund. The agreements and arrangements among the Fund, the Fund Manager and its affiliates have been established among them and are not the result of arms-length negotiations. Included are the following.

**Non-Exclusive Relationship**

The Fund Manager is subject to various conflicts of interest in the performance of its duties and obligations for the Fund. The services of the Fund Manager are not exclusive, and the Fund Manager may provide similar services to other clients, some of which have investment objectives and policies similar to those of the Fund. The Fund may therefore indirectly invest in securities in which other funds and accounts managed by the Fund Manager also invest. In addition, the Fund Manager may give advice and recommend securities to, or buy or sell securities for, such funds or accounts that may be different from the advice given to, or securities recommended for, the Fund even though the investment objectives of such funds or accounts may be the same as, or similar to, those of the Fund. There can be no assurance that the Fund will be afforded comparable investment opportunities to those directed to such other funds and accounts managed or advised by the Fund Manager. The Fund Manager will devote as much of its professional time to the Fund as it shall determine is appropriate. However, the Fund Manager has other business responsibilities. While the Fund Manager believes that there is generally a commonality of interest among its various business responsibilities, conflicts may arise in certain situations.

**Performance Allocations**

The Fund Manager and the Managers of Segregated Portfolios may receive performance-based compensation. Such performance-based compensation creates incentives to make investments that are riskier or

more speculative than would be the case in the absence of the performance-based compensation. In the case of Managers, unrealized appreciation of investments may be included in the performance-based compensation of such managers, without such appreciation ever being realized. Furthermore, the amounts of performance-based compensation paid by the Fund and the Segregated Portfolio Members will be variable and cannot be determined in advance. Depending upon the total return realized by the Fund and Segregated Portfolio Members, the amount of performance-based compensation paid to the Fund Manager and Managers may be high compared to a fixed fee paid to an investment manager for managing a comparable amount of money.

**Compensation from Managers**

The Fund Manager has entered into marketing and referral arrangements with certain Underlying Investment Managers entitling the Fund Manager to receive a portion of the fees earned by such Managers and attributable to referred clients. These marketing and referral arrangements apply to any investment by the Fund into a Segregated Portfolio managed by such Manager, thereby entitling the Fund Manager to receive a portion of the Asset Management and/or Performance Fees and/or commissions that are attributable to the Fund's investments in any such Managers' Underlying Investment. As a result of such marketing and referral arrangements, the Fund Manager has a substantial financial incentive to allocate Fund assets to Underlying Investments based on these arrangements rather than solely on their consideration of the Fund's and Shareholders' best interests.

**Participation of the Fund Manager in the Organization of the Fund**

The Fund Manager participated in the structuring and organization of the Fund. Thus, the selection of the Fund Manager, as well as the setting of the Fund Manager's compensation, was not the result of arms-length negotiation.

**Payments for Referrals of Prospective Shareholders**

The Fund Manager may engage certain persons and firms to refer prospective Shareholders to the Fund Manager and, in connection with any successful referrals, may assign such persons and firms certain of the fees and other compensation the Fund Manager earns from the Fund or may otherwise compensate such persons and firms out of its own assets and not out of the Fund's assets.

**Brokerage and Portfolio Transactions**

The Managers are solely responsible for investment decisions and for the execution of purchases and sales of the Segregated Portfolios.

Managers have no obligation to deal with any particular broker-dealer in the execution of securities transactions within the portfolio. In executing such transactions, the Managers are not required to obtain the best price and execution for its transactions thus the various Segregated Portfolios will not necessarily pay the lowest commission or mark-up. A number of the Fund Manager's principals own a substantial portion of an affiliated broker/dealer that will earn commissions and fees from the Fund; these fees and commissions were not negotiated at arms-length, although, the Fund Manager believes these fees and commissions are competitive with other broker/dealers.

Where best price and execution may be obtained from more than one broker-dealer, the Managers may purchase and sell stocks with or through broker-dealers who provide research, statistical analysis and other information to the Manager. Information so received will generally be in addition to and not in lieu of the services required to be performed by the Managers, and the expenses of the Managers will not necessarily be reduced as a result of the receipt of such supplemental information. Such information may be useful to the Managers in providing services to clients. The Fund Manager may periodically review the portfolio transactions of the managers to verify that the expenses of the Managers are reasonable.

## BRITISH VIRGIN ISLANDS REGULATIONS

The Fund will be a Professional Fund within the meaning of the Mutual Funds Act 1996, as amended (the "Mutual Funds Act") which means that the Shares of the Fund may only be issued to persons who are "Professional Investors" within the meaning of the Act and on the basis that the initial investment in the Fund by each of a majority of its shareholders is not less than $100,000. A Professional Investor is any person: (a) whose ordinary business involves, whether for his own account or the accounts of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property, of the Fund; or (b) who has signed a declaration that he, whether individually or jointly with his spouse, has net worth in excess of $1 million United States currency or its equivalent in any other currency and that he consents to being treated as a Professional Investor.

The Master Fund will be a private fund within the meaning of the Mutual Funds Act in that it will have no more than 50 investors.

As a Professional Fund (and as a Private Fund in the case of the Master Fund), the Fund and the Master Fund are required to be and will be recognized under the Act before they may commence business as a mutual fund and will be required to pay an annual recognition fee of $350. Such recognition does not involve an examination of the merits of an investment in the Fund or the Master Fund and does not entail supervision of the Fund's or the Master Fund's investment performance

or portfolio by the British Virgin Islands Government or the Financial Services Commission (the "Commission") in the British Virgin Islands. There is no financial obligation or compensation scheme imposed on or by the Government of the British Virgin Islands in favour of or available to the investors in the Fund.

As an entity regulated under the Act, the Fund and the Master Fund will each be subject to the supervision of the Commission, who is authorized by the Mutual Funds Act to direct the Fund and the Master Fund to furnish information or provide access to any records, books or other documents which it deems necessary to ascertain compliance with the Act or any regulations made under the Act.

The Mutual Funds Act provides that the Fund's or the Master Fund's Certificate of Recognition may be cancelled or made subject to conditions if, among other reasons, the Fund or the Master Fund has breached the Mutual Funds Act or any subsidiary legislation or conditions of its certificate, has been convicted of an offence, is carrying on business in a manner detrimental to its investors or to the public interest, or is declared bankrupt or is being wound-up or dissolved.

## Tax Information

**British Virgin Islands**

There is no income tax in the British Virgin Islands and the Fund, the Master Fund and the Shareholders of the Fund and the Master Fund will not be subject to any form of income tax in the British Virgin Islands. There are no capital gains taxes, capital transfer taxes, estate duties or inheritance duties in the British Virgin Islands.

## Anti-Money Laundering Regulations

As part of the Fund's responsibility for the prevention of money laundering, the Fund Manager and its affiliates and the Administrator may require a detailed verification of a Shareholder's identity, any beneficial owner underlying the Shares and the source of payment.

**Additional Information**

The Fund Manager reserves the right to request such information as is necessary to verify the identity of a subscriber and the underlying beneficial owner of a subscriber's or a Shareholder's interest in the Fund. In the event of delay or failure by the subscriber or member to produce any information required for verification purposes, the Fund Manager may refuse to accept a subscription or may cause the compulsory redemption of any such Member's Shares by the Fund. The Fund Manager, by written notice to a Shareholder may suspend payment of redemption proceeds to such Shareholder if the Fund Manager reasonably deems it necessary to do so to comply with anti-money laundering laws and regulations applicable to the Fund, the Fund

Manager or any of the Fund's other service providers.

**Shareholder Representation**

Each subscriber and Shareholder will be required to make such representations to the Fund as the Fund and the Fund's Manager will require in connection with such anti-money laundering programs, including without limitation, representations to the Fund that such subscriber or Member is not a prohibited country, territory, individual, or entity listed on the U.S. Department of Treasuries Office of Foreign Assets Control ("OFAC") website and that it is not directly or indirectly affiliated with any country, territory, individual, or entity named on an OFAC list or prohibited by any OFAC sanctions programs. Such Shareholder will also represent to the Fund that amounts contributed by it to the Fund were not directly or indirectly derived from activities that may contravene British Virgin Islands' and other applicable laws and regulations including anti-money laundering laws and regulations.

## Privacy Notice

The Fund and the Fund Manager recognize the importance of protecting the Shareholder's privacy. The Fund and the Fund Manager protect personal information they collect about you by maintaining physical, electronic, and procedural safeguards to maintain the confidentiality and security of such information.

**Categories of Information Collected**

In the normal course of business, the Fund and the Fund Manager may collect the following types of information concerning investors in the Fund who are natural persons:

a) information provided in the Subscription Agreements and other forms (including name, address, registration number, income, and other financial-related information); and

b) data about investor transactions (such as the types of investments the investors have made and their account status).

**How the Collected Information is Used**

Any and all nonpublic personal information received by the Fund or the Fund Manager with respect to the Shareholders who are natural persons including the information provided to the Fund by Shareholders in the Subscription Agreements will not be shared with non-affiliated third parties which are not service providers to the Fund or Fund Manager without prior notice to such Shareholders. Such service providers include but are not limited to the accountants, auditors, and legal advisors of the Fund. Additionally, the Fund or Fund Manager may disclose such nonpublic personal information as required by applicable laws, statutes, rules and regulations of any government, governmental agency or self-regulatory organization or a court order. The same

privacy policy will apply to the former shareholders.

For questions about this privacy policy, please contact the Fund Manager.

### Investor Suitability Standards

An investment in Shares involves a high degree of risk and should not be made by any person who cannot afford a complete loss of his investment therein. The Interests lack liquidity, as compared with securities and other investments. See "The Fund - Fund Objective" and "Risk Factors".

Each purchaser of a Share in the Fund is required to represent that the Share is being acquired for its own account, for investment, and not with a view to resale or distribution. The Shares are suitable investments only for sophisticated investors for whom an investment in the Fund does not constitute a complete investment program and who fully understand, are willing to assume, and who have the financial resources necessary to withstand the risks involved in the Fund's specialized investment program and to bear the potential loss of their entire investment.

### Additional Information

You are encouraged to ask the Fund Manager for any information you consider relevant to your investment decision. The Fund Manager will provide any information it can reasonably supply.

*Any inquiries should be directed to:*

Last Atlantis Capital Management LLC
1212 Bjerge Gade, Lower Level, St. Thomas, USVI 00802
Phone: (340) 777-5170
Email: info@lastatlantis.com

## FUND DIRECTORY

| | |
|---|---|
| **The Fund - Registered Agent and Registered Offices** | Last Atlantis Partners SPC, c/o Appleby Corporate Services (BVI) Ltd Palm Grove House PO Box 3190 Road Town, Tortola British Virgin Islands |
| **The Investment Manager** | Last Atlantis Capital Management LLC 1212 Bjerge Gade Lower Level St Thomas Virgin Islands |
| **The Master Fund** | Last Atlantis Partners Master Fund SPC, Ltd c/o Appleby Corporate Services (BVI) Ltd Palm Grove House PO Box 3190 Road Town, Tortola British Virgin Islands |
| **The Onshore Fund** | Last Atlantis Partners, LLC c/o Last Atlantis Capital Management LLC 1212 Bjerge Gade Lower Level St Thomas Virgin Islands |
| **Custodian** | Lek Securities Corporation 140 Broadway - 29th Floor New York, NY 10005 |
| **The Administrator** | Folio Administrators Limited Folio Chambers PO Box 800, Road Town British Virgin Islands |
| **Auditors** | Deloitte James Frett Building Wickhams Cay I Road Town Tortola, British Virgin Islands |
| **BVI Legal Counsel on matters of BVI law** | Appleby Hunter Bailhache Palm Grove House PO Box 3190 Road Town, Tortola British Virgin Islands |